23-1036 Eastern Missouri and Francisco et al. v. Tom Villmer et al. May it please the Court, good morning, Your Honors. I represent the family of the decedent here, Mr. Joshua Francisco. We're asking the Court to reverse summary judgment on qualified immunity for some correctional staffers and for the warden at the prison at the time down in Farmington. Joshua was a 39-year-old young man at that time. He was on his 112th day of incarceration at Farmington when this unfortunate event happened. He was there for making a with his kids, or his daughter, under an order of protection, so he violated that. I represent Mr. and Mrs. Francisco who are here. His son and daughter could not be here because they are in school at this time. Counsel, we've really got five cases here, so this is going to go very quickly. Sure, sure, and I'm going to get right to the point right now. I've got some questions about some specifics. Absolutely, Your Honor. So in particular, we believe that the Court erred in granting summary judgment on qualified immunity here. In particular, there's two parts of that test. Number one is, was there a clearly established constitutional right? That's undisputed here. There's no dispute about that in the briefs. That goes back in our jurisprudence from this Court back to the early 2000s, that there's an undisputed Eighth Amendment duty to provide reasonable safety to protect from the known risks of substance here is, were the correctional staff deliberately indifferent to Mr. Francisco's serious medical needs, mental health needs? There's plenty of evidence here that's really undisputed that they knew what was happening here with this young man. Counsel, let's talk about some specific defendants. Yes, sir. I'd like to start with Griffin. Can you tell me whether, taking the facts of the light most favorable to the plaintiff as we must, was Griffin informed by an inmate in an adjacent cell to Francisco? Not Francisco's cellmate, but an adjacent cell that Francisco was going to hang himself? Yes, I believe so, Your Honor. Both. From both. From the day before he was informed on the 21st, he was informed by the cellmate, as well as on the day of. We have to put this scene in context. They were doing the count at the time. At the time this happened on the morning, about 11, 15 in the morning on October 22, Your Honor. So the count was happening. Everybody was at their cell doors. Officer Gooch was down there, and he was hearing screaming and hollering from all the inmates that this guy's going to commit suicide. That's when he makes the call. That's when Griffin comes down there. Griffin hears all this commotion at the same time, too, from this group of people talking about this guy's going to commit suicide. With regard to Defendant Rhodes, when Rhodes was informed that an inmate had asserted that Francisco had a noose in his cell, what was his response? Rhodes' response was that he did look at the video to see if they found it of the search. There's a video that runs down the hall. Right, so that was going to be my follow-up. Yeah, sure. So he looked at the video. Was it an actual search of the cellmate? It's my understanding from the record that you couldn't see everything in the cell from the video. Unfortunately not. You could not see into the cell, so we don't know what type of search was done. We know that the officers reported they didn't find a noose. Whether the entire cell was searched, we don't know that. We do know a few hours later, the young man committed suicide with a noose. We do know that. We do know that also... You thought he hung himself with a sheet? No. Say that. I thought he hung himself with a sheet. Yeah, a noose formed from the sheet. Well, but the other was a wire or a thread, right? Say that again. I'm sorry, Your Honor. The noose was a... They found a rope or a... I don't think there was a noose found. No, but the report was of a rope. Of a noose. I think that's what the statement was. I don't know. So he didn't hang himself with a noose? No. Well, he fashioned... All right, I mean... He fashioned a noose from his bedsheet. That's correct. He was left in a regular non-suicide cell when they had noticed. To get to the point Your Honor just made, Rose also knew a few minutes after the hearing or after the confrontation at the cell, he was told by the correctional case manager, Scalion, about... And England, that Sergeant England, that this man was... That staffers... Or excuse me, that other inmates were reporting that Francisco was suicidal. So... With regard to Defendant Vilmer, what did he really know that would possibly make him... Well, he knew... Yeah, that's a good point. I mean, he's of course the warden, but we know this. He attended the involuntary medication hearing. He knew... And he said he was particularly or gravely concerned were his words. But you don't have actual knowledge? Yeah, that he was threatening suicide? No. We don't have information that Vilmer had actual knowledge, but I don't think we have to prove that the claim against him on allowing the unconstitutional custom and practice. Well, but there has to be an offending employee. Oh, there are. There are offending employees. Well, if you win another part of your argument. Yeah, there are. There's four offending employees. You lose on the other four what's left of the claim against Vilmer. Well, I don't... I mean, what's left of the... He had clearly allowed the custom and practice to go on of the magic words. I mean, that's what he allowed there. And that's why they didn't put him on... They all understood. I thought the first place he knew of that was in the investigative report. I don't think that's what he testified. He testified... Mr. Vilmer testified that he had heard that phrase before. He had attended training sessions. He admitted that wasn't brought up in the training sessions like it was supposed to be. They knew there was a... It's really important about that, Your Honor. Judge Loker, I'm glad you brought that up. That the director of mental health from Corizon testified that this culture had been going back, this magic words culture had been going back since the time that Mr. Vilmer became the warden. Well, that's a made-up term. Magic words? That's a term in the prison that the staffers used. We don't put them on the suicide watch unless they say the words. But you managed to put it in a incriminatory vernacular. I wish... I didn't make it up. That's what the inspector general of the Department of Corrections found out. He found that that was a term. We haven't talked about England yet, and he seems to be a person that has more direct knowledge of the immediate risk than the other defendants. He was there at the cell along with Griffin was there also. Griffin and England both responded to the call from Officer Gooch. England observed him crying. Yes, and tearful. Did Griffin observe that as well? Did he say that? Did I miss that when I was reading? He didn't say crying. He said he seemed upset. Okay. He seemed upset. He didn't say he saw him cry. He could have been crying. But certainly he was right there, Judge, and he would have heard the tone of Mr. Francisco's voice, that England himself was standing right in front of him. I mean, England, as you quite rightly point out, clearly said, I saw the man crying. I saw him tearful and upset, bad demeanor. Right, and that obviously is something that is different than somebody who just has generalized knowledge that there's a claim that a noose was present, a search has been done. The search does not yield a noose. And then afterwards, Griffin and England observe him quite upset, right? Yes. Okay, and were they together? So they would have had the same physical observations? Yes, sir. Yes, Your Honor. They were both at the cell. At the same time? At the same time, 11, 15 in the morning on the 22nd. Yes, sir. Judge, was there any distinction between what the two of them knew? And specifically, we talked about Griffin hearing from an adjacent cellmate that he was going to hang himself. Did England also know that, or is that a distinction between the two? Well, I think it gets a little confusing, I'll grant you, because apparently this had been said for a couple of days before. And so Griffin heard it the day before from an adjacent cell, but on the 21st. What had been set up? Say that again, Your Honor. What had been set up before? Had been said. Had been said that Francisco had been talking about suicide. I'm sorry. England's first exposure was on the 22nd. Yes, sir, Your Honor. That's the only exposure he had to Mr. Francisco, other than his prior knowledge that he had been on suicide watch. It was kind of a filling. What about cellmate versus adjacent cellmate in terms of? I don't think that that's constitutionally different. The point is, according to the Coleman case, and that one's really instructive here. It really, really, the court really held in Coleman versus Partman that magic words are not the law. Because the information in that case that the sheriff had was from an outside source. And the detainee, excuse me, my mouth's dry, the detainee specifically denied in that case that he was suicidal. But the court said, no, you had knowledge that he was threatening suicide. So, therefore, you should have taken appropriate measures. The facility will argue, and there's some support in our case law for this, that simply hearing from a cellmate is not very reliable. How would you respond to that? Well, that's not the policy of the State of Missouri, number one. Right, but violation of a policy is not per se deliberate indifference. Is not per se deliberate indifference. It certainly is under our case's evidence that can go to that subject. Here's the problem with that. If we allow that, if that's what we allow, that say that you can just out of hand ignore what these people, what an adjacent cellmate says, then you codify magic words really as the constitutional law, which is not the law, number one. And number two is, it creates this problem where we're elevating leaving prisoners over safety of prisoners. Which, if we find out a prisoner is lying about this, he can be disciplined. I mean, and that's the approach that should be taken, if he's lying, discipline him. Well, and with respect to defendant Scallion, she knew that he was not aware of his own mental illness. Right. He wouldn't have known whether he was suicidal during 20 years. Well, that's an argument. That's certainly what our experts talked about. This poor man didn't have a good insight. And that's what the Director of Mental Health, Ms. Sanderson, testified about that, too. That's what they were most worried about. But haven't we, in the past, discounted cellmate's representations? Say that again, Your Honor. Haven't we, in the past, discounted a cellmate's representation? In the – I think you may be referring to the Yellow Horse case, perhaps, Your Honor. Let's start with Brabbit. Okay. Your reply brief goes to great lengths to say the problem is, what's the standard review and the defense is arguing for the wrong standard. Wouldn't you agree that the standard is, on page 353 of Judge Erickson's opinion in Brabbit, the constitutional and dispositive question is whether the uncontroverted measures taken by the defendants were so inadequate as to be deliberately indifferent to risk of suicide. Yes. That's the standard. That's the standard. I agree with that. That's what the district court applied, and that's what the city is – the defendants are arguing. I agree that that's what they're arguing, and I agree. And Brabbit was one where there was a denial. There was this – Bill stated that he did not intend to commit suicide and expressed a desire for daily meetings with a treatment nurse. Right. Right. In this case – You know, it's more than just, well, yeah, some of our old cases may have said that, but forget them. No, I'm not saying that at all, Your Honor. I'm not saying forget them at all. I'm saying – My other question is, if he had been transferred to the RSU, would that have been compliance with this policy you're relying heavily on? Yes, absolutely. Does the record show what the supervision is in RSU? Yeah, I think it does show that in the SRU, the Social Rehabilitation Unit. Yes. Yeah, I think the record does show that. That is the equivalent of watch? That's not the equivalent of suicide watch. Well, that's what we're talking about. You're arguing there was constitutional violation because he wasn't instantly put on suicide watch. Yes, because he expressed suicidality. And yet they were waiting for him to be transferred to the RSU, which he had refused to agree to. Yes, he had refused to go. In terms of the efforts that they were making to ensure adequate protection, that was essential. And the failure for the transfer to have happened is not attributable to the defendants. The transfer was supposed to happen a week before, right? Yes, but he had blocked it. Well, that's the essence of what Judge Graves is talking about. This man wasn't even really calm.  I thought they'd overcome that at this hearing that Vilmer attended and said he was quite calm. No, he actually said he was gravely concerned about his mental health. That's what actually Vilmer said. I thought the hearing where, I guess that's where he got out from under protective custody. He got out from under protective custody on the 16th. And he said, oh, but I'm not going. He said, I'm not going, right. That's really an indicia of his mental health problems. I mean, when somebody's not even aware of their own problems, he's not to make those decisions. I mean, they've got in process a procedure that's going to be adequate, whether it's suicide watch or not. It's recognition of his mental health issues. Those are two different things, though. That's to help make him better. If he's in imminent danger of committing suicide, then he has to be put in a suicide cell per the policy. Really, the Constitution requires that. No. Yes, it does. The policy may. The Constitution, not necessarily. Well, the Brabbit case talks about that. He was put in the most suicide-proof area available. That's what was the key to that case. He wasn't in this case. He was left in administrative segregation in a cell with bars on it and, like he said, a blanket to hang himself with when his cellmate went off to recreation. I see my time's up. Any further questions, Your Honor? Thank you. Mr. Morello? May it please the Court. The critical issue here is deliberate indifference, and it's whether these defendants, my clients, by responding to the report, took adequate measures to abate the risk that Mr. Francisco, the decedent, presented. And we're asking to affirm the district court's judgment because the judge got it right. No reasonable jury could find that the officers exhibited deliberate indifference and meet that high critical criminal recklessness standard. And this is because there aren't any facts that show any subjective intent on the part of defendants. Whether it be the analysis of England, Griffin, Rhodes, and Scallion, or Vilmer, the 1983 deliberate indifference standard is one of personal nature, and it requires an individualized analysis. Counsel, what about one of the defendants taken in the light, most favorable to the plaintiff, shouting, he didn't say the magic words? Doesn't that show deliberate indifference? At first, my response would be the violation of a policy taken in the light most favorable, if we're assuming a violation of policy, in and of itself isn't a constitutional violation. The analysis is what they subjectively knew. And if they not only did they subjectively know, the defendant has to draw the inference. I think you were starting with the second prong. The clearly established prong? No, I'm sorry, with the deliberate indifference. You seem to be conceding that they knew. I'm not conceding that they knew, Your Honor. I apologize. Some of the defendants certainly knew. I guess we would disagree on what they knew because my reading of the transcript or the record, I'm not certain some of them knew. England certainly didn't know. I believe Rhodes knew that about the watch. But when they questioned Mr. Francisco, he was emphatic denial. It wasn't just a simple denial. It was four to five times they denied. And this analysis is what the judge relied on is indifference isn't a hindsight analysis. We're not playing Monday morning quarterback and wishing we would have done everything that we hoped we'd done. This is certainly a tragic result. What we look at is did they show something approaching apathy and unconcern? And that's not the case. They got the report from the inmates. And unlike in other cases, unlike in Coleman, they didn't ignore it. They went down and they ascertained the risk. They searched the cell. They found no noose. And they made that decision. And that's not indifference at most. It's in favorable, you know, in viewing the facts most in favorable light of the plaintiff. That's at most negligence. And that's not what we're here to determine. Deliberate indifference is a much higher standard. In fact, in the opinion, the court doesn't even, for qualified immunity on the part of the four corrections officers, not the warden, the court didn't even reach the clearly established prong of qualified immunity. The court found that there was no constitutional violation. And to that point, there's some critical facts here. And do you agree with the casual assertion that, well, it's been clearly established for decades? I don't agree. So I will agree. Pretty hard to say that in the wake of Pauli and all the Supreme Court revisitations on the clearly established doctrine in the last decade. I do believe that there's a right to be protected from a serious medical need of the risk of suicide. But that's a different contention than the clearly established. I don't think there's a case here that sufficiently describes the contours. And I don't think it's the defendant's burden to bring that case. And regardless, the court didn't even reach that. And in Vollmer's case in particular, I disagree with the assertion that the court made the decision on qualified immunity. In fact, in that opinion, the court didn't even use the phrase qualified immunity. There were separate arguments made. There was one of just deliberate indifference as a matter of summary judgment on the elements based on the record. And then there was a secondary qualified immunity argument. And the court, in that opinion, didn't even reach that argument. That the facts were so bereft on Vollmer's case that the court said that no reasonable jury could possibly believe it. Let's talk about Defendant Scallion. As I understand the evidence, she discussed Francisco every day because he was, quote, one of our suicide guys. She knew Francisco did not understand he was mentally ill. Francisco repeatedly told her, just euthanize me. And that on four dates, October 16th, 20th, 21st, and 22nd, his cellmate told her that Francisco was suicidal. She knew he'd been in a mental hospital and been on suicide watch before. And yet she did not put him on suicide watch. So you're saying that that is a reasonable response? I say that those facts are taken outside of October 22nd, the day of the suicide. I think the timeline is constructive here. The day before, Mr. Francisco had been seen by Corizon staff, the medical staff. And they said he has adequate protection. And then the day of the 22nd is when this report came that he was suicidal. And there's a note that he was going to be seen on the 24th. So what we're really talking about is their knowledge and what they thought was the, quote, they had to decipher what a strong likelihood was in the moment. So Scallion, based on her assertion and based on the investigation, and them repeatedly considering and talking to Mr. Francisco, doesn't rise to the level of that there would be a level of knowledge that would alert Scallion to a strong likelihood. Again, it goes back to this individualized. Well, I don't understand how it could be any more likely than that. Well. I'm sorry. It seems to me that the response is the issue, not the knowledge. But the claim, as I understand it, is that Scallion is aware that the Corizon medical officer had come in, talked to Francisco, arrived at the conclusion that he appeared to be functioning adequately at this time and was at no immediate risk of suicide. That's the day before. Scallion is aware of that? I do not believe the record shows that Scallion was aware of that. I'm not entirely certain. Okay. And so that was my question. So if Scallion and the rest of the officers were aware of that, that would be a different case, right? Because, you know, they called the medical people. The medical people came in. There was a conversation. And they've decided not to put him on suicide watch, right? And so then the facts of the 22nd would stand alone, right? You'd have to look at what happened on the 22nd alone. But if they're not aware of that, then all of those corrections officers are held to what they knew leading up to it. And that would mean that Scallion would know all the things that Judge Graz has recited but was unaware that some medical officer had said there's no risk. Well, if they're aware of everything leading up to it, then they would be aware of the October 21st evaluation saying that there was no adequate risk presented at that time. And this is taken also in the record. All right. So they're aware of that. That was my first question. And maybe I didn't ask it very articulately. I just don't want to say anything inaccurate. And off the top of my head, I would have to go back and answer. I think that's very important because we have to take the facts in the light most favorable to the plaintiff. We can't make inferences that they knew something that's not in the record. Yeah. And so it seems to me that if the record, and I thought when I read the record, the record was such that they were aware that medical had seen Francisco on the 21st and made a decision that he didn't need to be on suicide watch. In which case then, rather than considering all of the background things, even if we look at it in the light most favorable, the answer is, yes, those things were all known. The medical people went in and talked to him. And now we're just left with what we know on the 22nd. And what we know on the 22nd is the cellmates are saying and the guys next to the cell are saying that he's threatening to kill himself. The officers observed that he's quite emotionally distraught. He's crying or upset. And he has denied in those conversations that he's suicidal. And the question about that is whether you should act is a very different question than if we have the whole litany of things that happened before. And I believe they were aware of the previous date of the 10-21 medical report. I just can't give you an exact citation off the top of my head from this. But I do believe that even under those circumstances, we're talking about a disagreement that amounts to negligence, not everything that we wish that these officers had done with the benefit of hindsight. We're talking about at the time, did they have the subjective knowledge that he was going to do something that rose to the level of a strong likelihood? And they have to draw the inference themselves. It's not merely, we're not merely analyzing what, you know, something that's under a policy or something that would amount to negligence. It's a much higher standard. It's, indeed, a regular standard. And they simply didn't meet it here, so much so that the court, the district court decided that there wasn't enough. These weren't, and all the other cases are distinguishable because there was something or someone that was ignored. These different … In many of those cases, they placed the inmate on suicide watch. That wasn't done here. And the issue is, well, should they have done more? Here, they didn't even do the minimum suicide watch. I don't agree with whether the issue is whether they should have done more. I agree that the issue is whether these individualized defendants viewed in their own lens took adequate measures based on what they subjectively knew. And I … It's whether what they did was so inadequate. Right. It would be unconstitutional. Correct. And I agree. But I don't believe that they … The measures that they took were so unconstitutional based on that if every inmate that said, oh, I need to remove my cellmate, then that would create indifference automatically standing on its own. Viewed in light of what they saw, they went and they interviewed, they searched the cell, they asked multiple times and made sure. They reported to Defendant Rhoades, who reviewed the video, asked multiple people and case managers, and they didn't … But Defendant Rhoades knew that he couldn't see the entire cell from the video. Correct. But the people who searched the cell, searched the entire cell, searched the cellmate, searched Mr. Francisco and found no noose. And one of the threads that hasn't been discussed that much is that this isn't like the Coleman case where we have outside witnesses that are third parties with no motive. Oftentimes, unfortunately, these cellmates will have … Well, that's why I was asking the questions about the adjacent inmates, because our case law doesn't, I guess, doesn't discount those third-party representations, just the cellmates. I think that there were people yelling, but I think the record shows that when the first initiation came down on October 22nd, it was the cellmate, Ernest, who was specifically speaking to that effect. We have multiple people here all saying he's going to kill, he's going to hang himself. Multiple people. All that I saw in the record shows that there was people just yelling in a commotion, but the specific words were from the cellmate, Ernest. And based on that alone, it's not a constitutional violation for a defendant to say, well, based on this guy's words alone, this cellmate's words, based on the policy, based on what they have in front of them, it's not a constitutional violation to make a mistake. The key word there is alone. Right. But the key word is alone, and not only with the facts, like even with the crime, even with the policy. They have the subjective intent, and they fail to draw the inference that there's a strong likelihood. It shouldn't be commended. But we're not talking about a constitutional violation. Does record establish which of these defendants, if any, had the ability to place Francisco on a suicide watch? I believe they – I believe Rhodes would have had the ability, but I can't speak to certainty to it. That was my reading of it, too, is that Rhodes had the ability to place him on a suicide watch. All the others had was the ability to report to Rhodes that they thought there was a problem. Right. And does that affect the deliberate indifference claim? Like, if we were to find that there's deliberate indifference on the part of Rhodes, because, you know, in a light most favorable to the plaintiff, the video of the search was inadequate for Rhodes to reach the conclusion that was reached, and that the failure to take any further action could be deliberate indifference, given what they know. Is the analysis different? Does that make sense? It does, but I believe that goes back to the argument about negligence is not enough. If we're saying, oh, he didn't do the complete cell search, that isn't what Rhodes just relied on. He spoke with people. He spoke to the people who did the cell search, and at a certain point there has to be a line where Rhodes doesn't have to redo the entire investigation. These supervisors should be able to rely on the reports of these people. And ultimately, no one knows what was found. And given the circumstances, we can disagree and look back on day and wish things were different. It's certainly a tragic result. But negligence is not enough. Saying that they did the wrong thing under the policy is what we're talking about, and it's a high standard for deliberate indifference. And I see my time expiring, and we're just asking that the district court's judgment be affirmed on all defendants. Thank you for your time. Thank you. Give me a couple of minutes for rebuttal. Thank you. Just a couple of points. Go ahead, Erickson. You just raised that issue. Griffin did testify that any of them, even if the sergeant said he wasn't going to put them on suicide watch. Was what? That any of the correctional officers could put somebody on suicide watch and make a report. You didn't have to go to the functional unit manager. Putting them on watch and making a report are different things. Well, actually, they both happen to be. I assume procedural, more intense supervision is required. They both happen at the same time. So could they put him on suicide watch or could they not? Say that again, Your Honor. Did they have authority to put him on suicide watch? Yes. Yes. All of the correctional officers have that authority. And that's based on what? That's in the record. Griffin himself. In the record how? Griffin testified to that. Officer Griffin testified to that. That each officer had and the director of mental health said. He's not very high up the totem pole. I agree. All right. So is that testimony backed up by, you know. The director of mental health. Yeah. Well, exactly. The policy says that. That all correctional officers will immediately. When they hear information indicating that somebody is potentially suicidal. That's what the policy says. They will immediately put them on watch. And write the report and let the mental health. And what does the record say what happens then? I put him on watch. I put him on watch. He's under direct observation. And then he's. By whom? By the correctional officers. And he's transferred then to the suicide proof cell. Okay. That's where they don't have a bed sheet. And no bars to hang themselves with. And then the qualified mental health professional. Somebody employed by Corizon. Then makes the assessment. Whether they should be on watch continued or not. But that's the essence of this case. Talking to him is not enough. That's not the proper response. The correctional officers don't have the duty. Don't have the knowledge. To make a decision whether somebody is suicidal. If they get that information. They pass him on to the qualified mental health professionals. To make that decision. That's the essence. Why the response was inadequate. And there's no evidence in the record. That any of them knew about this assessment. The day before. Which was 20. Almost 30 hours before he committed suicide. So. We don't think that's relevant anyway. Any questions your honors? Thank you judge. Appreciate it. Thank you. Very good. Case has been thoroughly briefed. And arguments have been helpful. We'll take it under advisement.